No. 2968.

W. A. BYRD *v.* THE STATE.

1. PRACTICE—EVIDENCE—MARKS AND BRANDS.—CERTIFICATE of the county clerk of Young county to a copy taken from the record of marks and brands reads as follows:   "The State of Texas, County of Young. I, Chas. O. Joline, clerk of the county court in and for said county, do hereby certify that the foregoing is a true copy of the record of the mark and brand of Wilkins Bros."—Signed, with seal, etc.   *Held*, that such certification of the copy from the record was sufficient to show that the said mark and brand were recorded in Young county.

2. SAME—THEFT—The trial court did not err in permitting one of the alleged owners of the stolen cattle to explain, under oath, why one of the brands specified in the record was not placed upon certain of his cattle.

3. SAME—REPRODUCTION OF EVIDENCE—PREDICATE.—An essential part of the predicate whereunder it is competent to reproduce, on trial, by oral proof, the evidence delivered upon the examining trial by a witness who has since died, and the record of whose testimony has been lost, is affirmative proof not only that the defendant was present as the party on trial at the examining trial, but that he was afforded the opportunity to cross examine the witness. Failing in this latter respect, the predicate in this case was insufficient, and the trial court erred in admitting the reproducing testimony.

4. SAME.—Article 586 of the Code of Criminal Procedure requires that the clerk, in case of a change of venue, shall, before transmitting the original papers in the cause, make a correct copy of the same, to be preserved in his office, etc. *Held,* that the record of testimony taken before the examining court, and delivered to the clerk by the magistrate who held the said court, is not "an original paper" within the meaning of the statute, and therefore is not a paper of which the clerk is required to keep a copy, and, for that reason, it is not a valid objection that, before resorting to parol reproduction of the testimony of the deceased witness, the State should first have produced a certified copy of said testimony from the clerk of the court whence the venue was changed, or account for its non production.

5. SAME.—A State's witness testified that, at the instance of the agent of the alleged owners of the stolen animals, he went to the city of Memphis, and there found certain cattle in the brand of the alleged owners, and without having otherwise identified the animals, he further testified, over objection by the defense, that he sold the said animals under a power of attorney from the alleged owner, and delivered the proceeds of the sale to the agent for the alleged owners. *Held,* that the proof was *res inter alios acta,* and irrelevant, and, tending to prove the issue of ownership, its admission was material error.

APPEAL from the District Court of Palo Pinto, on change of venue from Young.   Tried below before the Hon. W. H. Devine.

The conviction in this case was for the theft of thirty-two head of cattle, the property of Wilkins Brothers. The penalty assessed against the appellant was a term of two years in the penitentiary.

Jack Wilkins was the first witness for the State. He testified that he was a member of the firm of Wilkins Brothers, the owners of the cattle mentioned in the indictment. The ranch of the Wilkins Brothers, where the witness lived, was situated about nine miles north from Graham, in Young county, Texas. The Wilkins Brothers owned between five and six hundred head of cattle on the range contiguous to the said ranch, all of which cattle were under the immediate care and control, and possession of the witness. The witness's brother lived in Utah Territory. Of the cattle described, one hundred and thirty head were three year old beeves, and of the said beeves the witness kept ninety head under herd from about November 1, 1883, until the evening of the thirteenth day of the same month, when he sold forty head of the same to Jasper Chambers, and turned the remaining fifty head loose upon the range. A vio-

lent norther sprang up on the next morning, and witness did not hunt the range to see what became of the said fifty head of beeves. He did not look for them until work reopened in the spring of 1884, when he missed between thirty-five and forty of the said fifty beeves. In the fall of 1884, the witness went to Grayson county, where he remained until the spring of 1885, visiting Young county in December, 1884, to attend the examining trial of the defendant, but arriving after the said trial was over. The witness's first knowledge of the charge against the defendant for stealing his cattle was derived from a telegram received by him in December, calling him to Young county, to testify on the examining trial. Jasper Chambers paid witness a check for the beeves he bought on the evening of November 13, 1883, and witness cashed the check on the next morning. Nicholson had talked to witness about buying cattle about the same time, but the negotiation came to nothing. The cattle were taken from the possession of the witness, in Young county, Texas, without his knowledge or consent.

Cross examined, the witness said that he only knew his cattle by the mark and brand. He did not miss the alleged stolen animals until the spring of 1884, and missed them only by their failure to " come up" with other animals.

J. A. Keith testified, for the State, that in November, 1883, he was one of the line riders of the Loving range in Young county, Texas. While riding his line on the morning of November 14, 1883, he saw George Herndon, Henry Ward and M. Chambers, driving a herd of about twenty-five mixed cattle. They were then about three and a half miles north of Graham, between Floy spring and Flint creek, and it was between nine and ten o'clock in the morning. On his cross examination, the witness said that he did not observe the marks or brands of the said cattle. He paid no special attention to them, as he knew that each of the parties owned cattle on the range, and frequently hunted the range together. He did not see either of the said parties again on the said day, nor again until the examining trial. He did not see this defendant at any time on the said November 14.

O. E. Finlay testified, for the State, that he lived in Graham, Young county, Texas, and was well acquainted with the defendant. When he first saw the defendant on the fourteenth day of November, 1883, he, defendant, was leading a horse across one of the streets in Graham. This was about half-past twelve o'clock. The witness and Laurie Voules soon after-

wards started to Turtle Hole, about eight miles distant from Graham, to shoot ducks. They overtook the defendant and Nicholson together, on horseback, about two miles from Graham, on the Farmer road. It was then about half-past one o'clock. Witness asked the defendant where he was going, and he replied that he was going to Blakey Flat. Witness then remarked that he was on the wrong road to go to Blakey Flat, and he responded that he and Nicholson intended to take the short cut through the timber. About four o'clock on the same evening the defendant came alone to Turtle Hole where the witness and Voules were, and witness asked him what he had done with his partner, to which he replied that his partner had gone across the country. During this conversation a man whom witness did not know appeared on the hill, at a short distance, when defendant joined him, and the two rode off in a northeast direction. On his cross examination, the witness said that he and Voules, when they overtook defendant and Nicholson on the Farmer road, told them that they were going duck hunting, but witness could not remember that they designated Turtle Hole as their destination. Turtle Hole had been a prominent stock watering point, but was not much used in November, 1883. The witness knew the location of Blakey Flat on the Graham and Henrietta road. Turtle Hole was not on any road, but was a half mile east of the Farmer road, and a mile west of the Henrietta road. The difference between the distance to Blakey Flat by the route then traveled by defendant and Nicholson, and the direct and shortest route, was at least half a mile. One of Loving's line riders lived in a house in Blakey Flat. Neither the defendant nor Ward had or owned any cattle at or near Turtle Hole.

L. Voules testified, for the State, substantially as did the witness Finlay, and, in addition, that the man who appeared on the hill near Turtle Hole, and with whom the defendant rode off, was Henry Ward. Ward did not come to the vicinity of the hole from the same direction whence the defendant came. The witness kept the livery stable in Graham. It was his recollection that Ward, Chambers and Herndon got their horses from the stable on that morning. He had no recollection of seeing defendant at the stable.

On his cross examination, the witness said that he and Finlay had been at Turtle Hole some time when defendant reached that place late in the evening. They bagged several ducks at

the said hole and went thence to a water hole on Flint creek, about two miles distant, and returned to Turtle Hole, where they were joined by the defendant. Defendant talked a while with witness and Finlay, and then left. He had not gone far when Ward appeared in the distance. Defendant and Ward met on the brow of the hill, and disappeared together in a northeast direction from Turtle Hole. About fifteen minutes later witness and Finlay left Turtle Hole, and by rapid driving reached town about dark. Witness and Finlay, when they overtook defendant and Nicholson, took a drink with them on Nicholson's invitation.

J. R. Harris testified, for the State, that he and J. F. Brim traveled together from Farmer to Graham on the fourteenth day of November, 1883. They stopped at the Milliken ranch, about five miles north from Graham, and while there the witness saw two men, about three hundred yards to the right of said ranch, driving a small bunch of cattle in a northeast direction. He did not recognize either of the men, nor did he see any of the marks or brands on the cattle. About the time that the men and the cattle passed the ranch, George Herndon rode up to where witness and Brim were. In the course of the conversation that ensued, Herndon said that he was hog hunting. Brim asked him if he was not hunting mavericks. Witness then asked him who the parties were that were driving the bunch of cattle. He replied: "Monroe and Henry." The witness knew Monroe Chambers and Henry Ward. Herndon then left, riding towards the men and the bunch of cattle.

Cross examined, the witness said that it was about eleven o'clock in the morning when he and Brim saw the men and Herndon and the cattle. To reach Turtle Hole, the cattle referred to would have to cross the public road on which witness and Brim were then traveling.

J. A. True testified, for the State, that he lived four miles east of Graham, and, in 1883, operated a lime kiln on Flint creek, north of Graham. One morning late in the fall of 1883 he saw four men rounding up a bunch of cattle on Flint creek, two miles west from Blakey Flat, and about a mile and a half distant from Turtle Hole. He did not recognize either the men or the cattle.

J. C. Loving was the next witness for the State. He testified that he knew A. A. Nicholson, who had died since the transaction which is the basis of this prosecution was investigated

before the examining court. The witness was present at the examining trial, saw the said Nicholson sworn by the magistrate, and heard him testify. Nicholson, on the said examining trial, testified to the effect that he and the defendant, George Herndon, Henry Ward and Monroe Chambers entered into an agreement to steal a number of cattle and ship them to market to be sold; that, under that agreement, the said Herndon, Ward. Chambers and the defendant were to take the cattle and deliver the same to him, Nicholson, and that he, Nicholson, was to pay them at the rate of two hundred dollars per car load; that, before embarking in that enterprise, the said parties told him that they would not receive checks in payment for the cattle they were to take and deliver to him, and that he must have the cash on hand to pay them; that accordingly he, Nicholson, went to the bank in Graham, and through it arranged and got one thousand dollars from W. C. Beckham & Son; that on the morning of November 14, 1883, he told the parties that he had money on hand with which to execute his part of the agreement; that Herndon, Ward and Chambers went to the range on that morning, and that he and defendant followed immediately after dinner, defendant suggesting that they go to their destination by the short cut through the timber; that when they got into the road, about a mile and a half or two miles from town, they were overtaken by Finlay and Voules, going hunting; that, after leaving Finlay and Voules, he and defendant went through the woods to Blakey Flat, at a certain point in which they found and joined Herndon, Ward and Chambers, in charge of a herd of cattle; that, on reaching the said parties, the defendant remarked that they had but few cattle; that Chambers was then left to hold the herd, and defendant and Ward left to go to Turtle Hole to get other cattle; that defendant and Ward soon returned with a small bunch of animals, and from the combined bunches cut out some animals which they said they did not want to take; that the said parties then declined to get any more cattle on that evening, as it was getting late; that Herndon then demanded that he, Nicholson, should pay them for the animals taken, and which were in the herd, and that witness ought to pay them one hundred dollars each, and pay Ward's part to him, Herndon; that, after some contention between Herndon and Ward, it was arranged for Ward's part to be paid to Herndon, and the payments were made accordingly; that Herndon and defendant then left, the former remarking that as

they lived in town (Graham) they had better go back to avoid being missed; that Ward and Chambers then helped him, Nicholson, take the cattle to Tolbert's place, where, arriving after night, they penned the cattle and remained until early on the next morning, when they started the herd; that when they had driven the cattle about a mile, they stopped, and cut out some steers in the E brand, which he, Nicholson, had bought from V. Wilkerson, which said steers he sent by Monroe Chambers to Jasper Chambers's pasture, his purpose being to separate them from the "crooked" animals, and so preserve them in case of arrest; that, being joined by John Lovell, he (Nicholson), Ward and Lovell then took the herd of "crooked" cattle to Fort Worth, driving the first day through the woods to avoid being seen; that when they reached a point about sixteen miles distant from Fort Worth, Ward became frightened and refused to go any further with the cattle; that he, Nicholson, told Ward that if he adhered to his refusal to go on to Fort Worth, he, Nicholson, would abandon the cattle and return to Graham, and endeavor to recover his money; that Ward replied that he did not care what action he, Nicholson, should adopt, as he had had trouble before, and would quit, which he did; that he (Nicholson) and Lovell then put the cattle in a pasture near Fort Worth, and, a few days later, shipped them from Fort Worth to Memphis, Tennessee.

Cross examined, the witness Loving said that Blakey Flat was on the Graham and Henrietta road, and that the five mile post, out from Graham, was on the northeast corner of the said Flat. The house of Ricks, one of witness's line riders, was situated in the Blakey Flat. Ricks rode the line from that house east, and Keith, another of witness's line riders, rode the line west from the same house. Each of the said line riders rode the line from the house in the morning and returned in the evening. Turtle Hole, which was a public watering place and a public branding place, but little used now, was about two miles distant from Blakey Flat. Questioned by the defense about Nicholson's testimony, the witness said that he could not recall the various incidents of the cattle transaction related by Nicholson, but could state that Nicholson inculpated the defendant as a participant in the fraudulent enterprise from its inception. The witness could not remember that Nicholson testified, on the examining trial, that before he and the other parties actually embarked in the fraudulent enterprise, and

while he was standing at the livery stable in Graham, discuss-
ing plans with Herndon, Ward and Chambers, he observed the
approach of the defendant, and asked the others if he, this de-
fendant, was "going into it too." The witness did not remem-
ber that Nicholson testified that, before the taking of the cattle,
Ward told him that he must get currency wherewith to pay him
and his confederates, and that checks "would not go." The
witness did not remember that Nicholson did or did not testify
that the defendant was present at the bank when Herndon told
him, Nicholson, that he and his confederates were ready to
proceed with the execution of their part of the fraudulent
enterprise as soon as he should announce that the cash was in
his hands to pay them. Among other things, Nicholson testi-
fied that it was dusk on the evening of November 14, when he
paid the money to the defendant and his confederates. He
testified also that he did not like the action of Wilkins in refus-
ing to sell cattle to him, and then permitting Jasper Chambers
to "top" the herd. He testified also that he told his confede-
rates, after being joined by John Lovell, that Lovell was bound
to know that the cattle were stolen. He also stated that he
saw the Wilkins cattle when they were under herd, and that
the majority of the stolen animals were of the Wilkins stock.
The witness caused the arrest of Nicholson and Lovell, and
employed private counsel to assist the prosecuting attorney in
this case. John F. Brim, now deceased, was the district at-
torney when Nicholson was arrested. With the knowledge
and consent of the witness, Brim promised Nicholson, if he
would turn State's evidence against his confederates, he would
call and try his, Nicholson's, case last, and make the penalty as
light on him as circumstances would permit. Nicholson agreed
to do so, and did testify on the examining trial, but, failing to
give the appearance bond required of him, he was put in jail,
and died in jail before the next term of court. At that time no
charge other than the one made in Collin county, upon which
he was arrested, was filed against Nicholson. He was detained
merely as a witness.

John Lovell testified, for the State, that he lived at Talbot's
place in November, 1883. On the night of the fourteenth day
of that month Nicholson came to Talbot's house and occupied
the same bed with the witness. He got up and left before the
witness awakened on the next morning. When witness got up
he went to a point on the range, a mile or more from Talbot's

ranch, and found Nicholson in charge of a small bunch of cat-
tle. Monroe Chambers was a short distance beyond him, hold-
ing the bunch of steers in the E brand. Nicholson, Henry Ward
and the witness then started with the cattle Nicholson had, to
Fort Worth, driving through the woods the first day, and after-
wards over or near the public roads. When they reached a
point within fifteen miles of Fort Worth Ward left the cattle.
Witness then helped Nicholson put the cattle in a pasture, and
afterwards to put them on cars to be shipped. Witness was
satisfied that the bunch of cattle was stolen at the time that he
helped drive them out of Young county. The majority of the
cattle in that bunch were in the circle Z brand on the side, and
other brands on the body. Witness did not see this defendant
with Nicholson or the bunch of cattle at any time.

W. R. Bigham testified, for the State, that he knew all of the
parties implicated in the theft of the Wilkins cattle. In No-
vember, 1883, the witness and George Herndon were joint
owners of a stock of cattle that ranged on Flint creek, north of
Graham, in Young county. The defendant's cattle, at that
time, were on a different range, southeast from Graham. Be-
fore noon on the morning of November 14, 1883, Nicholson
came to the witness in Graham and told him that "the boys"
were going to put him up a bunch of cattle, and asked the
witness if he did not have a few old "drys" to put in, and asked
witness to go with him on that evening to the range where the
cattle were being "put up." Witness declined to go. Nichol-
son then offered him ten dollars to go, and then twenty, and
finally fifty dollars. Witness still declined to go, but told him
that Bill Byrd would go with him. About that time defendant
joined them, and witness said to Nicholson: "Here is a man
who will go with you." Nicholson then offered defendant fifty
dollars to go with him, and defendant replied: "All right; I'll
pull you a lot." It was about noon when Nicholson proposed
to defendant to go with him. A short while before that the
witness saw the defendant and told him of Nicholson's attempt
to employ him in the matter, and advised defendant to ar-
range with Nicholson to go with him. Defendant at first de-
clined upon the ground that his wife was approaching confine-
ment, and he could not leave her. Witness then pressed the
defendant to go into the transaction with Nicholson, and he
again declined, upon the ground that his horse was not at
home. Witness then proposed to furnish him a horse, and he

agreed to go for the witness. The purpose of the witness in getting the defendant to go into the transaction was to protect his, witness's, interest. He was satisfied in his own mind that a bunch of cattle was going to be "pulled;" was suspicious that his partner, Herndon, would put in some of the partnership stock and not account to him for his interest, and he wanted the defendant to go along and see that none of his cattle were included in the "crooked" bunch. Soon afterwards the defendant's horse came up, and he and Nicholson left town together a little before one o'clock. The witness next saw the defendant on the following morning, when he told witness that he saw the herd, and that it did not include any of the witness's animals. Witness asked him what cattle they had. He replied: "Mostly circle Z's, and a few of other brands," which he mentioned. Witness then asked him if he got his fifty dollars, and he replied that he did.

The State then read in evidence the copy from the records of Young county, and certificate attached, as follows:

| No. | Owner. | Residence. | Mark. | Brand. | Location of Brand. | Date of Registration. |
|-----|--------|------------|-------|--------|--------------------|------------------------|
| 1682 | Wilkins Bros. | Young Co. | Crop and split in each ear. | Circle Z Z | Left side. Left thigh. | May 25, 1883. |

THE STATE OF TEXAS, ⎫
COUNTY OF YOUNG. ⎭　I, Chas. O. Joline, clerk of the county court in and for said county, do hereby certify that the foregoing is a true copy of the record of the mark and brand of Wilkins Bros.

[L. S.]　Witness my hand and the seal of office, this 28th day of October, 1884.

　　　　　　　　　　　CHAS. O. JOLINE,
　　　　　　Clerk County Court, Young County.

Rowan Tucker was the next witness for the State. He testified that he was a deputy sheriff of Tarrant county, and held that position in November, 1883. In the latter part of the said month the witness was employed by George Loving, for J. C. Loving, to go to Memphis, Tennessee. On arriving at Memphis he found a bunch of about forty head of cattle in the possession of one Lacroix. Of the said forty head of cattle thirty-two

were branded circle Z on the left side, which was the holding brand. The cattle had other brands on them. The 82 brand and other brands on some of the animals were barred out. The witness took down the brands at the time and entered them in the book now exhibited to him. There was but one of the thirty-two circle Z animals that had a plain Z branded elsewhere on the body, but the witness could not now say on what part of its body the said plain Z was. The animal last referred to was marked with an underbit in the left ear and a swallow fork and underbit in the right ear. The bunch included about twenty steers, ranging in age from two to five years old, the majority being three year olds. Among the "past two year olds" was a certain small red steer, which, being in very poor condition, was sold to a soap factory. Another animal particularly remembered by the witness was a brindle muley four year old steer. The witness sold the said animals under a power of attorney executed to him by Wilkins Brothers, and sent the money received for them to J. C. Loving. The two muley steers described were branded with a circle Z and the figures 82 on the side. The testimony of this witness is the subject matter of the ruling announced in the fifth head note of this report.

Jack Wilkins was recalled by the State, and testified as follows: " The cattle branded 82 and in other brands were bought by Wilkins Brothers from the several owners of the said brands, and the several purchases were evidenced by bill of sale. My beef cattle were branded circle Z on the left side and did not have the Z on the thigh. I first had my brand recorded circle Z in March, 1883, in Young county, and afterwards had discontinuance entered, and had my brand recorded as appears by the certificate in evidence. I did not have the Z brand put on my beef cattle, as I expected to sell them; and I did not intend by the new brand to abandon the circle Z on beef steers." Cross examined, the witness said that he never saw the cattle in Memphis. He did not miss any of his cattle until the spring of 1884, and among those missed were a certain red muley and a certain brindle steer, one about three and the other about four years old.

By agreement the State read in evidence the affidavit of E. B. Norman, clerk and assistant cashier of W. C. Beckham & Son's bank in Graham. It was to the effect that on the evening of November 13, 1883, acting for the bank, he paid to A. A. Nich-

olson the sum of six hundred and seventy dollars in currency, on his check for one thousand dollars, the difference representing two collections against Nicholson, then in the hands of the bank.

The State closed.

The witnesses Gilmore, Short and Whitehead testified, for the defense, that they saw the defendant in the town of Graham between sun down and dark on the evening of November 14, 1883. The witness Adair testified, for the defense, that " a week or two, or perhaps a month or so," prior to the alleged theft, he saw one of the defendant's mares on Blakey Flat, of which fact he informed the defendant, in the fall of 1883, prior to the alleged theft.

*Lanham & Stephens*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE. I. It was not error to admit in evidence the certified copy of the record of the mark and brand of Wilkins Brothers. It sufficiently appears from said certified copy that the said mark and brand had been recorded in Young county, and said certificate is made by the clerk of the county court of said county, which officer, under the law, is the legal custodian of the records of marks and brands for said county, and is authorized to certify thereto. Nor was it error to permit the witness Wilkins to explain why it was that one of the brands specified in said record had not been placed upon certain of his cattle. That portion of said witness's testimony which might, perhaps, be regarded as inadmissible was withdrawn from the consideration of the jury by the charge of the court.

II. We think the court erred in permitting, over defendant's objection, the witness Loving to reproduce the testimony of the deceased witness Nicholson, taken before an examining court. A sufficient predicate to admit said testimony of said deceased witness does not appear to have been established. Conceding that it was satisfactorily shown that the written testimony of said deceased witness had been taken before an examining court, and that the same had been lost, it was not shown that the prosecution in which said testimony was taken was against the defendant, and that he was afforded the privilege of cross

examining said witness Nicholson at the time said testimony was taken. It was shown that the defendant was present at the examining court when said testimony was taken, but, to render such testimony admissible against him, the statute not only requires that he must have been present, but also that he must have been afforded the privilege of cross examining the witness. (Code Crim. Proc., art. 774.) If he was not a party charged in said prosecution, and was not afforded the privilege of cross examining said witness, clearly said testimony was not admissible against him, and to admit it over his objections, without proof of facts establishing the predicate required by the statute, was material error, the said testimony being of a material character, calculated to injure the rights of the defendant.

Article 586 of the Code of Criminal Procedure, which requires the clerk, in case of a change of venue, before transmitting the original papers in the cause, to make a correct copy of the same, does not, in our opinion, require him to make such copy of testimony taken before an examining court. Such testimony is not included in the words "original papers" used in said article. It is not required that the same shall be filed by the clerk and kept with the papers of the cause; but, on the contrary, it is made the duty of the clerk to deliver the same to the foreman of the next grand jury, or to the district or county attorney. (Code Crim. Proc., arts. 315, 771.) When he has so delivered the same, it is no longer in his custody or under his control. It was, therefore, not a valid objection to the reproduction by parol of the testimony of the deceased witness, that a certified copy of said testimony from the clerk of the court from whence the venue of the cause had been changed was not produced, nor its non production accounted for by the State.

III. It was error, we think, to admit the testimony of the witness Tucker, over defendant's objection, in so far as it related to the authority under which said witness acted in selling cattle in Memphis, and the disposition made by him of the proceeds of such sale. These matters were *res inter alios acta* and irrelevant. It was material error, because such testimony tended to prove an important issue in the case, that is, the ownership of the cattle found in Memphis by said witness.

IV. Several other supposed errors are assigned by the defendant and insisted upon as cause for a reversal of the judg-

ment. We have, however, determined the only questions which we deem important, or which are likely to arise on another trial.

Because of the errors we have specified, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered November 14, 1888.